**Jennie SHAMEY, Plaintiff,**

v.

**ADMINISTRATOR, GENERAL SERVICES ADMINISTRATION, Defendant.**

**Civ. A. No. 87–1491.**

United States District Court, District of Columbia.

Jan. 23, 1990.

Joel P. Bennett, Washington, D.C., for plaintiff.

Michael T. Ambrosino, Asst. U.S. Atty., Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

This matter was tried *de novo* by the Court on May 8, 9 and 10, 1989, as required by *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976). The Court, having considered the testimony of the witnesses, all exhibits admitted in evidence, the proposed findings of the parties, and the applicable law, makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. This case was brought *pro se* on June 2, 1987, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e–17 (Title VII), the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621–634 (ADEA), and the Equal Pay Act of 1963, as amended, 29 U.S.C. § 206(d)(1). On December 9, 1988, plaintiff's counsel, Joel Bennett, filed an amended complaint alleging discrimination and reprisal in plaintiff's employment.

2. At the outset of the trial, plaintiff's counsel announced that the case "involves a number of different complaints, some of which will be introduced for background purposes only under *United Airlines* versus *Evans* and others which have been timely filed, administrative remedies have been exhausted, and are ripe for adjudication by the Court." More specifically, plaintiff's counsel then stated that:

The three major issues that we expect to be pursuing are the failure of the agency to promote the plaintiff after a desk audit was conducted showing that she was doing grade–13 work; the selection and transfer of a Mr. Dorman, D-o-r-m-a-n, to a grade–13 position within the agency when the plaintiff was better qualified for that position and should have been promoted; and the selection of Ms. Brooks for another grade–13 position. And we expect to prove that that was preselection and also discrimination and reprisal against the plaintiff.

3. These events allegedly occurred while plaintiff Shamey was employed at the Office of Real Estate Policy and Sales (DR), Federal Property Resources Service (FPRS), General Services Administration (GSA). The sex (female) discrimination allegedly has been on-going in GSA since 1978, the retaliation since late 1984, and the age discrimination since 1987.

4. Plaintiff Shamey is over 40 years old and a female citizen of the United States whose parents emigrated from Syria. She started her government career doing research in the United States Department of Agriculture (USDA) at the grade–9 level after she earned a Master of Science degree. Plaintiff Shamey, besides Bachelor and Master of Science degrees, also has a Doctor of Philosophy degree. She has taken numerous real estate courses, became a licensed real estate salesperson in 1976, and a broker in 1978. By 1984, she had most, and perhaps all, of the courses required to be warranted as a contracting officer for the U.S. Government. She has taught at the high school and college levels. She was promoted to the grade–11 level after eight years when she decided to leave her job at USDA to return to school to improve her credentials for doing research at USDA. After she earned her Ph.D., USDA would not rehire her.

5. Plaintiff worked for the USDA as a GS–9 until February 13, 1978, when she was hired by the Federal Supply Service, a part of GSA, as a chemist, GS–11. She was reassigned later, on October 19, 1979, as a Commodity Management Specialist, also GS–11. This reassignment was not subject to a merit promotion plan because it was a change from a position having no known promotion potential to a similar position. On October 31, 1982, plaintiff started working for DR, FPRS, where she is presently a GS–12 Realty Specialist.

6. Immediately following her October 19, 1979, reassignment, plaintiff filed a series of complaints. She filed her *first* complaint against GSA with the Equal Employment Opportunity Commission (EEOC) on October 29, 1979, claiming GSA had discriminated against her on the basis of sex because she had not been hired initially at the GS–12 level in February 1978. A Hearing Examiner affirmed GSA's proposed finding, which determined that Shamey did not qualify for the GS–12 position because of lack of experience and education. A final agency determination of no discrimination issued on February 17, 1982, and the case was closed on February 23, 1982. The EEOC affirmed the final agency decision by an undated letter.

7. On August 12, 1981, Shamey filed her *second* EEO complaint within GSA, alleging discrimination on the basis of national origin, sex, and handicap. She claimed she was handicapped because of her advanced education, and that her mental skills were too highly developed for the agency. GSA rejected the complaint because it was not timely filed. Shamey took no further action on this complaint.

8. Seven months later, on March 19, 1982, Shamey filed her *third* EEO complaint within GSA. She alleged discrimination on the basis of her sex. She claimed that she had applied for a number of positions in Saudi Arabia, but had never been selected. GSA rejected the complaint be-

cause it was not timely filed. Shamey took no further action on this complaint.

9. On March 14, 1983, plaintiff, now a GS–12 at DR, FPRS, requested to be detailed to the Eastern Division within the Office of Real Property (DRE). The detail was not to extend beyond July 11, 1983, and was officially terminated on August 28, 1983. On that day Shamey was reassigned to the Western Division, Office of Real Property (DRW).

10. For approximately six months after Shamey was reassigned to DRW, she worked almost exclusively on the National Advertising contract. Earl Jones, then Assistant Commissioner for Real Property Disposal, recommended that her performance be recognized, and as a result plaintiff was awarded a one time, special cash award in the amount of $1,500 for the work she performed on the advertising contract. Jones, the Commissioner of FPRS, testified that he had hoped the award would act as an incentive for plaintiff to appreciate the fact that the agency recognizes good work.

11. On February 12, 1985, Shamey filed her first EEO complaint against the Office of Real Property, and her *fourth* within GSA. At this time, Shamey had been in the Office of Real Property approximately 27 months, and in the Western Division 17 months. She alleged discrimination on the basis of her sex. She charged: that she was changed from being the case officer on Guam and Hawaii, and assigned Region 10 and that a male replaced her as case officer on Guam and Hawaii; that a pattern of actions during the period 1980–1984, including non-promotions, existed which evidenced discrimination against her; that her duties as Region 10 case officer were at a GS–13 level but she had not been promoted from GS–12 to GS–13; and that her performance had been improperly rated. She requested a desk audit to determine the grade level of her performance.

12. On July 11, 1985, Shamey filed her second EEO complaint against the Office of Real Property, and her *fifth* within GSA. She alleged discrimination on the basis of national origin, sex, and reprisal. She stated four grounds *inter alia:* that she was denied promotion after the desk audit; that she had been placed in absent without leave status (which was later removed after she provided medical documentation); that she had been prohibited from using GSA's equipment for personal typing; and that she had been advised to notify her supervisor if she was engaged in outside employment.

13. As a result of plaintiff's desk audit, and prior to the filing of her July 11, 1985, complaint, assignments for GS–12 Realty Specialists in DRE and DRW, who performed work substantially similar to plaintiff's, had been adjusted so that only GS–13s and above provided policy guidance, and GS–12s and below would discuss only other aspects of disposal matters with regional personnel. GSA rejected plaintiff's July 11, 1985, EEO complaint, and plaintiff appealed to the EEOC. *Shamey v. General Services Administration,* EEOC Appeal No. 01860598. The failure of defendant to promote plaintiff after the desk audit is the first of the three issues which plaintiff's counsel stated that he expected to pursue.

14. On September 3, 1985, plaintiff filed her *sixth* EEO complaint within GSA, alleging discrimination on the basis of sex, national origin, and reprisal. She alleged that management failed to approve her requested change of duty hours. The complaint was rejected on October 4, 1985, because the shorter hours requested were in violation of applicable personnel regulations.

15. One month later, on October 2, 1985, Shamey filed her *seventh* EEO complaint within GSA, alleging discrimination on the basis of national origin, sex, and reprisal for previous filed complaints, again because management failed to comply with her request to change her duty hours. This complaint was cancelled for failure to prosecute after she and her attorney failed to respond to a request for further information. Plaintiff did not appeal GSA's cancellation of her complaint to the EEOC.

16. On November 18, 1985, Shamey filed two EEO complaints, each alleging discrimination on account of national origin, sex, and reprisal for previous filed

complaints. One complaint alleged that her contributions to the organization went unrecognized while those of a white male were lauded in an intra-GSA publication. GSA rejected this complaint on December 6, 1985, because she had received a monetary award for one of her projects. Plaintiff did not appeal GSA's rejection of her complaint to the EEOC.

17. The second complaint filed on November 18, 1985, alleged that she had been advised by Frank Roche, who was then acting as her immediate supervisor, that her position would always be a GS–12. This complaint also contained an almost verbatim recount of the matter she complained of in her February 12, 1985, EEO complaint. GSA likewise rejected this complaint, determining that her GS–12 slot had no promotion potential, and that her only possibility for promotion was to move into another position by competitive application; thus, she had suffered no injury and was not threatened with future harm. Plaintiff did not appeal the Final Agency Decision to the EEOC. These allegations are not contained in her amended complaint in this action.

18. On December 20, 1985, Shamey filed her *tenth* EEO complaint within GSA, and her seventh in 1985, alleging discrimination on the basis of national origin, sex, and reprisal for her previous filed complaints. She alleged that three memoranda received in the Central Office from the region, which complained about her performance and which had not been previously revealed to her, had been secretly used against her by management.

19. GSA accepted this complaint for investigation. The complaint, however, was cancelled on August 26, 1986, for failure to prosecute, because Shamey would not respond to the investigator's, and GSA's, repeated requests for information. Plaintiff, on December 4, 1986, appealed GSA's cancellation of her complaint to the EEOC. The EEOC dismissed her appeal as untimely. *Shamey v. General Services Administration*, EEOC Appeal No. 01870628. The agency granted plaintiff's petition to re-open the matter. EEOC then affirmed the agency decision on May 28, 1987.

20. On January 10, 1986, plaintiff filed her *eleventh* EEO complaint within GSA, alleging that management discriminated against her by reassigning Thomas Dorman, a male formerly employed by FPRS but then employed by Public Building Service (PBS), another service within GSA, into a GS–13 slot, rather than announcing the position for competition. *Shamey v. General Services Administration*, EEOC Appeal No. 01870579. Plaintiff discovered the reassignment on July 15, 1985, and the transfer became effective on July 21, 1985. Although plaintiff did not contact an EEO counselor until August 26, 1985, more than thirty days after the alleged discriminatory event, GSA did not reject this complaint as untimely. GSA, however, did reject plaintiff's January 10, 1986, complaint on the grounds that Shamey had suffered no harm. Plaintiff appealed to the EEOC, and on May 27, 1987, the EEOC issued a decision requiring GSA to investigate the alleged discriminatory reassignment. Accordingly, GSA investigated these allegations. Plaintiff did not appeal the EEOC decision within thirty days to this Court. The selection and transfer of Thomas Dorman is the second of the three issues which plaintiff's counsel stated that he expected to pursue.

21. While Shamey was absent on leave without pay (LWOP), FPRS was reorganized. The Western Division, her last official assignment, was abolished. Shamey was reassigned to the Surveys and Compliance Division (DRS) effective October 1, 1986. Shamey remained in the same grade, step, and occupational code, and changed from a position having no known promotion potential to a similar position.

22. On January 22, 1987, approximately three months after her return from LWOP, Shamey filed her *twelfth* EEO complaint within GSA. She alleged that the transfer of Thomas Dorman from DRS to the Operations Division (DRO) in the FPRS reorganization that took place on October 1, 1986, was discriminatory on the basis of sex and national origin, and in reprisal against her

for previously filing EEO complaints. She did not complain about the reorganization. GSA rejected this complaint on April 9, 1987, and Shamey did not appeal to the EEOC.

23. On July 7, 1987, Shamey filed her *thirteenth,* and so far, her last EEO complaint within GSA. She alleged that the competitive promotion of Sandra Brooks, instead of Shamey, to a GS–13 Program Analyst position, Series 345, was an act of reprisal against Shamey for having previously filed EEO complaints. Shamey also alleged that she had been qualified in the past for positions that had been denied her, and that candidates had been pre-selected for positions. GSA accepted for investigation the portion of her complaint which related to the most recent competitive announcement, and rejected those portions which related to matters occurring more than thirty days before the filing of her complaint. Shamey did not appeal the rejected portions of her complaint to the EEOC. The competitive selection of Brooks to a GS–13 position is the third of the three issues which plaintiff's counsel stated that he planned to pursue.

24. Based on the above facts, it is an understatement to say, and we so find, that plaintiff, Jennie Shamey, is an inveterate filer of discrimination complaints. She comes before this Court with some sixteen or more EEO complaints having been filed against various federal agencies since 1977.[1]

25. Plaintiff's complaints mix serious allegations of discrimination in promotion and hiring, *see* July 8, 1987, EEO complaint, with essentially frivolous matters, such as not being "recognized" in a GSA internal newspaper, and not being permitted to end her work day at 2:00 p.m., in contravention of personnel regulations, so that she can seek outside employment.

26. When GSA has accepted an EEO complaint and initiated an investigation, plaintiff has frequently failed to prosecute it. When she received a special award for outstanding performance, she complained of discrimination because "[t]he award was handed to me unceremoniously in a very brief private meeting ...", when one year after her award another individual's accomplishments "are trumpeted [sic] by Earl Jones in award speeches before a vast audience...."

27. There was considerable evidence presented at trial which detailed plaintiff's abrasive and combative personality and inability to work with her superiors as well as employees at her own level. Defendant's witness Earl Jones, Commissioner of FPRS, testified that the Director of the Eastern Division came to him and said: "[Y]ou must remove Ms. Shamey from my division ... [s]he's disrupting the entire organization ... would you please remove her." When Mr. Jones transferred plaintiff to the Western Division, where she was under the direction of John Neale, at least three employees who were assigned to work with plaintiff on a particular project informed Mr. Neale, within a very short period of time, that they were unable to do so. According to Mr. Jones, in his almost twenty-seven years with GSA, he has never experienced a situation like the one in this case.

28. Defendant's witness John Neale, Assistant Commissioner, Office of Real Estate Policy and Sales, testified that plaintiff's inability to get along with other employees caused very difficult problems for management because the programs involved considerable interaction with other personnel. When asked by the Court if plaintiff's inability to get along with others was limited to people in supervisory posi-

---

1. Judge Flannery made a specific Finding of Fact in *Shamey v. Bergland* that "[p]laintiff [Shamey] filed discrimination complaints against other federal agencies [besides the Department of Agriculture] that rejected her applications for employment as a research scientist in the area of chemoreception research." *Shamey v. Bergland,* 30 F.E.P. Cas. (BNA) 253, 258 (D.D.C.1978). This finding indicates that plaintiff has filed at least two discrimination complaints in addition to the one she filed against the Department of Agriculture. The addition of these three to the thirteen filed against GSA makes a total of at least sixteen EEO complaints.

tions or extended to persons at her own level, he responded:

> She's had extreme difficulty there as well. She's had difficulty dealing with the people she worked with in the Boston Region and the San Francisco Region and the Seattle Region. She had difficulty in the Eastern Division where the Supervisor requested that ... her detail be denied because of her disruption of the immediate office as well as problems with the region.
>
> She's had other problems with the people in the advertising contract. There were several people supposed to work with her as a team, her peers, and that didn't work out. It just seems she has difficulty working with other people.

Tr. Vol. II, at 132–33. The above testimony, to which we attach complete credence, also reveals that plaintiff's inability to get along with others has involved a great number of people in various positions and offices around the country. We find that plaintiff possesses a combative personality which has legitimately prevented her from successfully competing for a GS–13 promotion.

29. We attribute what can be euphemistically described as plaintiff's "forceful personality" to her own admission that she comes from a matriarchal society where "mothers are dominant in the household" and "so for for me to state my mind and speak up and to disagree and be emotional, that is part of being Syrian." This may explain in part her disposition to litigate. Further explanation for her bizarre conduct in filing numerous EEO complaints, many of which were frivolous or were not pursued, may also lie in the fact that during the period when she filed ten complaints (1985–1987), she was under severe stress and anxiety which affected her emotionally as well as physically. She has described these in considerable detail. In fact, she was in a LWOP status for ten months in 1986, consulted a number of psychiatrists and psychologists, and in March 1988 was hospitalized for a heart problem. Upon this record we are unable to find that plaintiff acted in bad faith in acting as she did, such as would justify the imposition of sanctions. *See Copeland v. Martinez*, 435 F.Supp. 1178, 1181 (D.D.C.1977), *aff'd*, 603 F.2d 981 (D.C.Cir.1979), *cert. denied*, 444 U.S. 1044, 100 S.Ct. 730, 62 L.Ed.2d 729 (1980).

30. GSA's attempts to accommodate the plaintiff have met with consistent failure. GSA has repeatedly, at plaintiff's request, transferred her. GSA granted her almost eleven months of LWOP, while retaining her on the agency roles and keeping her position open for her return. Plaintiff essentially ignored any further processing of her EEO complaints during that time, and returned to the agency only when she felt she could again work on her EEO complaints. Upon her return to work, she filed an EEO complaint based on an employee transfer that took place some ten months after she went on leave and a month before her return, even though she was in the Near East at the time the transfer took place and was unavailable to fill the position, and even though the position was a GS–13, which plaintiff knew she could fill only by successfully competing under a merit promotion announcement.

31. Plaintiff occupies a GS–12 Realty Specialist position, occupation code GS–1170. The full performance level for this position is GS–12. It has no promotion potential. That plaintiff wants a promotion to a GS–13 position is an understatement. She has requested a promotion in each of her thirteen EEO complaints filed with GSA. What she has done in the ten years she has been with GSA is wage a war by EEO complaint designed to obtain without competition the promotion she has not obtained competitively, just as she earlier used EEO complaints in an attempt to obtain a job noncompetitively. *See Shamey v. Bergland*, 30 F.E.P. Cas. (BNA) 253 (D.D.C.1978).

32. Despite the fact that plaintiff has filed thirteen separate EEO complaints since 1979 and has incorporated a number of the issues contained therein in the amended complaint, plaintiff in this action has limited her case at trial to three claims of disparate treatment: (1) the failure of

the agency to promote the plaintiff after a desk audit was conducted; (2) the selection and transfer of Thomas Dorman to a GS–13 position within the agency; and (3) the selection of Sandra Brooks for a GS–13 promotion. These are discrete claims of disparate treatment and each was the subject of an EEO complaint. The remaining ten claims which were dismissed for a variety of reasons or for which no appeals were taken were introduced for "background purposes only."[2]

### 1. *The Desk Audit*

33. The Desk Audit determined that plaintiff was performing some duties of a GS–13 Realty Specialist. Once a desk audit reveals that an employee is performing above a designated GS-level, management has the right to reduce the duties of the employee (as well as all similarly situated employees) rather than grant that employee a GS-level upgrade. Plaintiff's expert witness, Mr. Katz, did not dispute this point.[3]

34. The evidence reveals that the Desk Audit had implications beyond the case of plaintiff Shamey. Workers other than plaintiff, who were outside the protected class, were equally affected by the Desk Audit. For example, defendant's witness James Berthold testified that a GS–12 employee named Jim Clay, working in the Western Division, had his regional respon-

sibilities removed from him along with the plaintiff. Thus, it is clear that the Desk Audit had an impact on the responsibilities of all GS–12 employees within the agency who were similarly situated to the plaintiff.

35. In addition, the agency had to consider the budgetary implications of the Desk Audit. If the agency had decided to promote all employees affected by the Desk Audit to GS–13s, it would have had to pay considerably higher salaries to these workers, which would have created budgetary concerns for the office.

36. Finally, management had been instructed that all GS–13 slots had to be competitively advertised in the agency.

### 2. *Thomas Dorman Transfer*

37. The evidence reveals that the promotion of Thomas Dorman to a GS–13 occurred in a division other than the one in which plaintiff was working and was unrelated to any action complained of by plaintiff. The agency had the authority to transfer him laterally to a GS–13 Reality Specialist position rather than to announce a vacancy and allow employees to compete for the position. In the words of plaintiff's own witness, the agency's actions were "perfectly legal."

38. Thomas Dorman's transfer did not involve a promotion and no GS–12s in FPRS were given the opportunity to com-

---

**2.** Plaintiff made a limited statistical showing, which may be summarized as follows:

In fiscal years 1982 and 1987, 16.38 and 16.79 percent, respectively, of professional employees in GSA were female. The representation of white females in 1982 and 1987 was below the 1980 CLF rate. As of September 30, 1988, 23.1 percent of GSA's grade 13 to 15 level employees, and 10.1 percent of its Senior Executive Service employees were women. GSA does not identify Arab–American employees in its workforce analysis. At least until October 31, 1986, all managers in DR were males except for one grade 14 female.

Assuming the complete accuracy of these figures and assuming plaintiff is thereby attempting to claim that this is a discrimination complaint based on "pattern and practice," which it is not, plaintiff's statistical showing falls far short of what is necessary to make such a showing relevant and probative. This is because a Title VII plaintiff does not make out a *prima facie* case of disparate impact by showing that

there is a sexual imbalance in the work force. She must also show that it is the specific or particular employment practice that has created the disparate impact under attack. *Wards Cove Packing Co. v. Atonio,* —— U.S. ——, 109 S.Ct. 2115, 2124–25, 104 L.Ed.2d 733 (1989). This the plaintiff has not done.

**3.** We have considered the report of plaintiff's expert, Paul A. Katz, who contended that, with respect to the Desk Audit, GSA erred in not advising Shamey of her further appeal rights, *i.e.,* to the Office of Personnel Management, which, had such an appeal been taken, would have placed the appeal in abeyance and required that GSA provide a full and complete classification report. Mr. Katz, with respect to the merit selection of Sandra Brooks, also argues that the qualification requirements, which only Brooks could meet, were, in effect, a preselection of Brooks for the GS–13 position. We are unpersuaded by either of these contentions.

pete for the position. Plaintiff recognized that this was the case for *all* GS–12 employees regardless of sex, age, or national origin.

### 3. *Sandra Brooks Promotion*

39. Marjorie Lomax, Director of the Policy and Planning Division of GSA, who was the selection official, carefully weighed the qualifications of all applicants before choosing Sandra Brooks for the GS–13 Program Analyst position. Ms. Lomax testified that she chose Sandra Brooks because of her legislative experience and her ability to work with other people. Ms. Lomax was not cross-examined.

40. Ms. Lomax explained that while several persons in the office worked predominately on legislative issues, the GS–13 Program Analyst was responsible for preparing and responding to legislative proposals, testifying before committees, and handling the budget for the office. We find that the plaintiff did not possess legislative experience comparable to that of Sandra Brooks.

41. In addition to weighing the legislative experience of the candidates, Ms. Lomax also considered the applicants' ability to work under pressure and to get along with other people. We further find that plaintiff was less capable than Sandra Brooks of interacting and getting along well with other people.

## CONCLUSIONS OF LAW

### A. *TITLE VII*

1. This Court has jurisdiction over the subject matter of the amended complaint.

2. 42 U.S.C. § 2000e–16 is the exclusive remedy for federal government employees complaining of employment discrimination. *Brown v. GSA*, 425 U.S. 820 (1976).

3. Plaintiff has failed to carry her burden of proving by a preponderance of the evidence that her non-selections were a product of discrimination.

4. In a case alleging disparate treatment under Title VII, the ultimate factual inquiry is whether the defendant intentionally discriminated against the plain-tiff—that is, whether the defendant treated plaintiff less favorably than others because of her race, color, religion, sex or national origin. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983); *McKenzie v. Sawyer*, 684 F.2d 62, 70 (D.C.Cir.1982). To establish a claim of discrimination, the plaintiff must therefore prove discriminatory animus on the part of the defendant. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *McKenzie v. Sawyer*, 684 F.2d at 70.

5. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set forth the allocation of burdens and order of presentation of proof in a Title VII case alleging disparate treatment. First, the plaintiff must prove by a preponderance of the evidence a *prima facie* case of discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *see McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. In a case alleging discriminatory failure to promote, the plaintiff must show that: (1) she belongs to a protected group; (2) she was qualified and applied for a promotion; (3) she was considered and denied the promotion; and (4) the position remained open and was filled by a similarly qualified employee from outside the protected group. *See Burdine*, 450 U.S. at 253 & n. 6, 101 S.Ct. at 1093 & n. 6; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Mitchell v. Baldrige*, 759 F.2d 80, 84 (D.C.Cir.1985); *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C.Cir.1981). In short, plaintiff's evidence as to the alleged discrimination must be sufficiently strong to raise the inference that any differences in treatment were motivated by one of the prohibited factors. *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *McKenzie v. Sawyer*, 684 F.2d at 71.

6. If the plaintiff is successful in establishing a *prima facie* case, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory reason for

the challenged actions. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *McKenzie v. Sawyer*, 684 F.2d at 71. This burden is not one of persuasion. To sustain this burden, the employer need only introduce evidence from which the trier of fact could rationally conclude that said employer was not motivated by discriminatory animus. *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1095.

7. Finally, in order to prevail, the plaintiff must then establish by a preponderance of the evidence that the defendant's stated reasons are not the true reasons, but are simply a pretext for discrimination. *Id.* at 253, 101 S.Ct. at 1093; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *McKenzie v. Sawyer*, 684 F.2d at 71. At this point in the order of proof, the plaintiff's burden "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Although the burden of production shifts between the plaintiff and defendant, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff throughout the entire case. *Id.* at 253, 101 S.Ct. at 1093; *McKenzie v. Sawyer*, 684 F.2d at 71.

8. Title VII "was not intended to 'diminish traditional management prerogatives,'" or to accord preferential treatment to minorities or women. *Burdine*, 450 U.S. at 259, 101 S.Ct. at 1096 (citations omitted). Preference for a better qualified applicant is recognized as a legitimate, nondiscriminatory basis upon which to differentiate among applicants. *Downey v. Isaac*, 622 F.Supp. 1125, 1132 (D.D.C.1985), *aff'd without opinion*, 794 F.2d 753 (D.C.Cir.1986).

#### (i) Thomas Dorman Transfer

9. Plaintiff claims the selection and transfer of Mr. Dorman to a GS–13 position within the agency resulted from discrimination on the basis of sex, national origin, and reprisal.[4] The credible evidence, however, fails to support plaintiff's claim.

10. The Court finds that plaintiff has failed to prove by a preponderance of the evidence a *prima facie* case of discrimination relating to the agency's decision to transfer Thomas Dorman from the PBS to FPRS as a GS–13 Realty Specialist. Specifically, plaintiff has failed to produce evidence that she (1) was qualified and applied for a promotion, and (2) was considered and denied the promotion. *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

11. Thomas Dorman was transferred as a GS–13 Realty Specialist from PBS to a GS–13 Realty Specialist at FPRS. His lateral transfer therefore did not involve a promotion. No GS–12s in FPRS were given the opportunity to compete for the position. Plaintiff acknowledged that this was the case for *all* GS–12s regardless of sex, age, or national origin.

12. Thomas Dorman was promoted to a GS–13 by PBS, not by FPRS. This decision was completely unrelated to any complaint or action involving the plaintiff in this action.

13. The evidence establishes that the agency had the authority to transfer Thomas Dorman into a GS–13 Realty Specialist position rather than to announce a vacancy and allow employees to compete for the position. Plaintiff's own expert witness acknowledged that the agency's actions were "perfectly legal." Moreover, he did not challenge the Dorman transfer in his consultation.

14. The testimony of plaintiff's own witness reveals that management had a need for someone with Thomas Dorman's qualifications. There is no credible evidence challenging the agency's authority to transfer Thomas Dorman without competition. The Court additionally finds no evidence that plaintiff, or any of the other employees, were better qualified for the GS–13 Realty Specialist position.

15. Based on the evidence, the Court concludes that the plaintiff has failed to establish by a preponderance of the evidence that the transfer of Thomas Dorman

---

**4.** The discrimination claim pertaining to reprisal is discussed in section B(i).

was discriminatory. *See* Findings of Fact, 37–38.

#### (ii) Sandra Brooks Promotion

■ 16. The Court finds that plaintiff has failed to prove by a preponderance of the evidence a *prima facie* case of sex, age, or national origin discrimination concerning the promotion of Sandra Brooks to a GS–13 Program Analyst position. Specifically, she has not demonstrated that she belongs to a protected group. *See Burdine*, 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

17. Sandra Brooks was a woman. Thus, there was no showing of sex discrimination. In addition, there was no evidence presented by plaintiff that Sandra Brooks was under the age of forty at the time of her promotion to a GS–13 Program Analyst. Therefore, the Court also finds that there was no basis for an allegation of age discrimination.

18. Finally, the Court finds no basis for plaintiff's allegations of national origin discrimination. The only evidence in support of these allegations is her own testimony that she is outspoken and that this is a trait of the Syrian culture.

19. There is no evidence that any of the persons in management were aware of Ms. Shamey's national origin, and even if they were, much less any evidence that it impacted on their decision making.

20. Based on the evidence presented, the Court finds that plaintiff has failed to establish by a preponderance of the evidence a *prima facie* case of discrimination on the basis of sex, age, or national origin. *See* Findings of Fact, 39–41. Even assuming that she has made a *prima facie* case, defendant's reasons for failure to select Shamey were not pretextual.

#### (iii) The Desk Audit

■ 21. Plaintiff's effort to establish discrimination in connection with the course of action chosen by agency officials as a result of the Desk Audit falls far short of the mark. The credible evidence established that management properly exercised its right to reduce the duties of all those who were found to be performing at a higher level rather than promote them and upgrade their GS pay scale.

22. The Court finds that the plaintiff has failed to establish that the agency's decision to reduce the responsibilities of all similarly situated employees under the Desk Audit was simply a pretext for discrimination.

23. As with the promotions of Thomas Dorman and Sandra Brooks, the plaintiff has failed to establish discrimination in connection with the Desk Audit because the defendant has articulated legitimate, nondiscriminatory reasons for the agency's action that were not shown to be pretextual.

24. The plaintiff has put forward no evidence which supports a finding that the agency's articulated reasons were simply a pretext for discrimination.

25. Based on the totality of the evidence presented, including the Court's assessment of the demeanor and credibility of the witnesses, the Court finds that the plaintiff has failed to establish discrimination on the basis of sex, age, or national origin in connection with the reduction of her responsibilities as a result of the Desk Audit. *See* Findings of Fact 33–36.

### B. *REPRISAL*

■ 26. In asserting a claim of unlawful reprisal, which is a form of discrimination under Title VII, the plaintiff is faced with the same standards and allocations of burden of proof as in the sex discrimination context. *See McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984). Once again, proof of discriminatory intent is critical. "[T]he plaintiff must establish that the employer had actual or imputed knowledge" of the plaintiff's complaint activity, "and that motivated by such knowledge, the employer acted with the intent to retaliate against or to punish" the plaintiff. *Downey v. Isaac*, 622 F.Supp. at 1132.

27. To establish a *prima facie* case, the "plaintiff must show: (1) that she engaged in a statutorily protected activity; (2) that the employer took an adverse personnel

action; and (3) that a causal connection existed between the two." *McKenna v. Weinberger*, 729 F.2d at 790; *see also Mitchell v. Baldrige*, 759 F.2d at 86. In short, plaintiff must establish facts sufficient to permit an inference of retaliatory motive.

28. As in the sex discrimination context, once this burden is met by the plaintiff, the defendant must articulate a legitimate non-discriminatory reason for the adverse action taken, followed by plaintiff's burden of proving that the proffered reason was simply a pretext for retaliation. In the final analysis, the plaintiff bears the burden of showing that she was the victim of the employer's intentional retaliation. *See McKenna v. Weinberger*, 729 F.2d at 790; *Downey v. Isaac*, 622 F.Supp. at 1132.

29. In reviewing the merits of a reprisal claim, the court in *Brosnahan v. Eckerd*, 18 F.E.P.Cas. (BNA) 511, 516 (D.D.C.1977), recognized the caution that must be exercised in analyzing such claims: "A court must always be aware that reprisal can take subtle forms but there cannot be a rule that insulates an employee from adverse personnel actions merely because a discrimination complaint has previously been filed." Similarly, the court in *Mitchell v. Visser*, 529 F.Supp. 1034, 1046 (D.Kan.1981), noted:

> Title VII provides a shield against discrimination or sanctions arising by opposition to or participation in Title VII proceedings, but this court will not permit the shield to be turned into a sword to enable the plaintiff to act in a manner and fashion that totally defeats the employer-employee relationship.

#### (i) Thomas Dorman Transfer

30. Plaintiff does not dispute that Thomas Dorman was promoted to a GS–13 *prior* to being transferred to FPRS. Thus, the only issue for the Court to decide is whether the agency's decision not to announce and allow competition for a vacancy was the result of retaliatory conduct towards the plaintiff.

31. The testimony of plaintiff's own witness established that other employees, including individuals outside the protected group, would have liked an opportunity to compete for the position filled by Thomas Dorman. In fact, plaintiff recognized that management's decision not to announce a vacancy and allow competition applied to all GS–12s regardless of sex, age, or national origin. Therefore, the Court concludes that the plaintiff has failed to establish by a preponderance of the evidence that her inability to compete for the GS–13 position filled by Thomas Dorman was retaliatory or otherwise discriminatory.

#### (ii) Sandra Brooks Promotion

32. Plaintiff has failed to show that the agency engaged in retaliatory actions in connection with the promotion of Sandra Brooks to a Program Analyst, GS–13. The Court concludes that the defendant articulated legitimate, non-discriminatory reasons for the challenged action that were not shown to be pretextual.

33. Plaintiff complains that her failure to be promoted to a Program Analyst, a senior position at the GS–13 level, was retaliatory. After assessing the demeanor and credibility of the witnesses, the Court gives full credit to the testimony of Marjorie Lomax, Director of the Policy and Planning Division of GSA, who detailed why Sandra Brooks was better qualified for the position.

34. Ms. Lomax testified that while several persons in the office worked predominately on legislative issues, the GS–13 Program Analyst was responsible for preparing and responding to legislative proposals, testifying before committees and handling the budget for the office. Ms. Lomax emphasized that the position required an individual who was capable of working under pressure and getting along with others.

35. Of the four candidates, Ms. Lomax chose Sandra Brooks because of her legislative experience and her ability to work with other people. Plaintiff did not possess comparable experience with legislative matters. Moreover, plaintiff was clearly less able to get along with people within the organization as well as outside the organization.

36. Contrary to plaintiff's assertion that the agency's decision not to promote her was retaliatory, the Court finds that Ms. Lomax was especially careful to fully review the plaintiff's qualifications thoroughly and ensure that she was fairly considered along with the other applicants.

37. The Court finds that there was no evidence presented by plaintiff to suggest that Sandra Brooks was not better qualified for the Program Analyst promotion. Plaintiff has not presented any credible evidence questioning Sandra Brooks' ability to work well with others, or challenging that her legislative experience was more specifically related to the responsibilities of the subject position. Plaintiff's implication that Sandra Brooks was hired out of nepotism was clearly rebutted by the testimony of Earl Jones. Moreover, plaintiff's allegation that the Program Analyst position was tailored by management to fit Sandra Brooks' qualifications was rebutted by the testimony of John Neale that these positions were created by Personnel completely separate and apart from management.

38. The Court finds that there is ample evidence that plaintiff possesses an unfortunate personality and was unable to get along with her colleagues as well as persons outside the organization.

39. The agency articulated legitimate, nondiscriminatory reasons for promoting Sandra Brooks to Program Analyst, GS–13, that were not shown to be pretextual. Specifically, Sandra Brooks' legislative experience and ability to get along with other people was superior to that of any of the other candidates, including the plaintiff.

40. Based on the totality of the evidence, including an assessment of the demeanor and credibility of the witnesses, the Court concludes that the plaintiff has failed to establish by a preponderance of the evidence that her failure to be promoted to a GS–13 Program Analyst was retaliatory or otherwise discriminatory.

*(iii) The Desk Audit*

41. Plaintiff has failed to show that the agency's decision to reduce her responsibilities rather than to upgrade her pay after the Desk Audit was tainted by reprisal for previous discrimination claims against the agency. The Court concludes that the defendant articulated legitimate, nondiscriminatory reasons for the challenged action that were not shown to be pretextual.

42. The evidence reveals that the agency considered a class of similarly situated employees as well as other legitimate nondiscriminatory factors in deciding a course of action subsequent to the Desk Audit. Thus, the Court concludes that plaintiff has failed to establish by a preponderance of the evidence that the agency's decision to reduce her responsibilities in Region 10 as a result of the Desk Audit was retaliatory or otherwise discriminatory.

## C. *EQUAL PAY ACT*

43. In a sex discrimination case alleging unequal compensation such as this one, Title VII and the Equal Pay Act[5] must be construed in harmony. *Orahood v. Board of Trustees*, 645 F.2d 651, 654 (8th Cir. 1981); *see County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981); *Kouba v. Allstate Insurance Co.*, 691 F.2d 873 (9th Cir.1982) (once a *prima facie* case has been made, employer bears the burden of proving affirmative defenses under the Equal Pay Act). Title VII explicitly recognizes the overlay between the two laws by providing that any differential authorized by the Equal Pay Act shall not constitute a violation of Title VII. *See* 42 U.S.C. § 2000e–2(h); *Gunther*, 452 U.S. at 167, 101 S.Ct. at 2246.

44. Furthermore, to establish liability in a suit under the Equal Pay Act, plaintiff must demonstrate that both her supervisors and the classifiers of her agency had knowledge of the existing salary discrepancy. *See Cayce v. Adams*, 439 F.Supp. 606,

---

5. "Equal Work" under the Equal Pay Act does not require that the jobs be identical, but there must be a substantial identity of job functions. *See Hodgson v. Golden Isles Convalescent Homes, Inc.*, 468 F.2d 1256, 1258 (5th Cir.1972); *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 265 (3d Cir.), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970).

609 (D.D.C.1977); *see also Usery v. Board of Education,* 462 F.Supp. 535, 568 (D.Md. 1978); *cf. EEOC v. Maricopa County Community College District,* 736 F.2d 510, 515 (9th Cir.1984) (supervisor initiated plaintiff's assumption of greater job responsibilities).

45. To make a *prima facie* case for violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1), plaintiff must establish that "the employer pays workers of one sex more than workers of the opposite sex for equal work." *Corning Glass Works v. Brennan,* 417 U.S. 188, 196, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974). Thus, the issue is not whether a complainant performs at a higher *grade* than that at which she was paid. Rather, the plaintiff must show that she performed work of "equal skill, effort, and responsibility" as a member of the opposite sex, but was not paid as much. 29 U.S.C. § 206(d)(1).

46. Employment under a merit system is a defense under the Equal Pay Act. *Id.* Shamey's position was, and is, one in a merit system; it is covered by the civil service classification scheme. 5 U.S.C. §§ 5102(a), 5107.

47. If examined under the standard set forth in the statute, the amended complaint fails to allege a *prima facie* case of a violation of the Equal Pay Act. Plaintiff has failed to allege that males who performed equivalent work were paid more, were the same grade as she, and performed work of "equal skill, effort, and responsibility"; she has failed to allege that the merit system under which the payments were made was not a bona fide system; and finally, Shamey has included women, members of the protected class, in the list of co-workers she claims are discriminatorily paid more than she is paid. *See EEOC v. Aetna Insurance Co.,* 616 F.2d 719, 725–26 (4th Cir.1980). Removal of duties without a decrease in pay does not create an Equal Pay Act claim. *See Leveen v. Stratford Housing Authority,* 629 F.Supp. 228 (D.Conn.1986).

48. The true gravamen of plaintiff's Equal Pay Act allegation is that she was performing GS–13 work while a GS–12.

*See generally* Complaint. It is not a sex based complaint. Indeed, she complains that she was performing as well as certain female GS–13s. Plaintiff's real complaint is that her position was misclassified. The proper avenue of redress is to appeal the classification of her duties to the Office of Personnel Management. *See* 5 U.S.C. § 5107.

49. For the reasons discussed above, the Court finds that plaintiff has failed to establish a *prima facie* case under the Equal Pay Act.

### III. CONCLUSION

50. For all of the foregoing reasons, judgment is entered in favor of the defendant on all discrimination claims raised by plaintiff in this action and this case shall stand dismissed with prejudice.

An order consistent with the foregoing has been entered this day.